Good morning, Your Honor. Jane Sweeney on behalf of the Alliance for Catholic Health Care. May it please the Court. We would propose to divide our time evenly with the other prospective interveners. Your time. Thank you, Your Honor. You can divide it any way you want. Thank you. Your Honor, the issue on appeal in this case is really one that gets down to two essential issues. Obviously, the Alliance of Catholic Health Care, representing the Catholic health care system in California, sought to intervene in a case in which a statute, it was sought to intervene to defend a statute passed by Congress to protect organizations such as the Alliance for Catholic Health Care from viewpoint discrimination in the award of federally funded health care contracts. The Alliance sought to intervene to really defend important rights pertaining to viewpoint discrimination and to be free from viewpoint discrimination in the eligibility and award of important contracts that receive federal funding. The mission of Catholic health care is one that is rooted in a deep sense of an ethical principle, an ethical viewpoint regarding the rendering of health care that is unique to the Catholic religious tradition and one of long and distinguished history. And the second, of course, is the notion that Catholic health care exists primarily to serve the poor and underserved, which, in fact, it does in this state with, I think, considerable distinction. Counsel, you've got to persuade us, I guess, of two things. One, that government counsel isn't going to adequately represent your interests. And the other is whether in this particular case, which is kind of narrowly focused, whether you really do have an interest. Now, if the Weldon Amendment is unconstitutional, the California statute still stands. The only possible somehow interest, it seems, that probably as long as that amendment stands, California feels restrained to in any way restrict or discriminate against your group. I guess that's where the issues are. I think the issue, and I think that's correct, Your Honor, that's a correct assessment of really the issues that are before this Court. With respect to the issue of impairment, while it is true that there are California statutes that are in play, the important point in this particular situation is whether or not Catholic health care would be free from discrimination in its ability to compete for important federal health care funds applicable primarily to impoverished populations. If the Weldon Amendment fails, is found to be unconstitutional, the State, by virtue of its complaint on filing this action as indicated, certainly by filing it to seek relief from the Weldon Amendment, an intention to discriminate in the allocation of those contracts, were that not the case, then there would be no problem with the Weldon Amendment because there would be no interruption in eligibility for the State for federal funds.  I'm not sure I understand that. Kennedy, before the Weldon Amendment was passed, the California statute was on the books. Correct? The statute related to conscience in ---- That you're concerned that California is going to enforce against ---- With respect to the provision of medically necessary abortions, correct, although I think in this ---- although I don't want to ---- No. I'm just trying to understand what ----  I'm not sure what the federal funding aspect is. The federal funding aspect comes with respect to the competition for federally funded health programs, in our case, primarily for impoverished populations. Catholic health care does not provide abortions in its hospitals at all. Right. Okay. There has never been, to date, an effort to compel or to force those abortions on Catholic health care. When the Weldon ---- there have been elsewhere in the United States, which was the impetus for the Weldon Amendment. When the Weldon Amendment was enacted, it was done with the intention of rendering a characteristic approach to discourage States from discriminating against religiously affiliated health care providers such as the Alliance members in competing for grants so that preconditioning eligibility on the provision of abortion was not a disqualifying factor for obtaining Federal funds. The State promptly sued the Federal government to invalidate the Weldon Amendment and seek an interpretation of the California statute with respect to whether or not emergency abortions do, in fact, violate the Weldon Amendment, et cetera, indicating that, I think, by conduct and certainly by word in the contract ---- in the complaint, that there was an intention in the future to discriminate. In other words, to put a quid pro quo. But the same laws have been in the books for 20 years, and there's been no effort to apply them. Am I correct? In addition to the ---- these are criminal statutes, right? In some cases, they are. I think they primarily go to regulatory eligibility for licensing, Your Honor, to be a licensed health care facility and so forth. But there are certainly, in some cases, some criminal statutes. The Constellation of statutory provisions in California, which some of which I thought were criminal, and some of them have to do with licensing and how does funding Federal ---- the receipt of Federal funding, how is that affected? Well, currently, if you are a licensed health care provider in the State of California and you operate an acute care facility, for example, like we do throughout California, you can apply for Federal grants for certain programs for public health. And how could the State interfere with that? The State could interfere with that by, A, conditioning the disbursement of those grants upon a condition that you provide a full range of abortion services. That's one. Could you explain that? Sure. If, for example, you apply for ---- Just make sure I understand. The application for Federal funding is made to the State? They're block grant programs in many instances. I don't know what that means.  sum of money for public health. So the answer to my question is, yes. The money is funneled through California. Sure. So I'm just trying to understand. No, no. I understand. So the California can block the funneling of Federal funding because the health care provider doesn't comply with this California statute. Precisely. Okay. Okay. So getting ---- Well, the amendment, did they ever seek to block or refuse to allocate from the block grants from the Federal government? In California, well, and admittedly, Your Honor, I'm going to speak a bit outside the record. There have been efforts before the California Medical Commission, unsuccessful to date, to put such preconditions in effect. Okay. But the filing of this lawsuit is really the first affirmative step by the State to indicate its attempt to engage in such discrimination in a formal way, which is the purpose of the getting relief from the well-done amendment. And isn't that kind of a leap of faith? That's what you think they're going to do? I think, Your Honor, when they file a lawsuit to ask for relief from a statute to permit them to engage in conduct that would otherwise render them ineligible for Federal funding altogether, that gives a pretty clear indication the State has an intention of beginning to move in that direction very soon. Otherwise, this case would be an advisory opinion. It would not be ---- there would be no Article III jurisdiction. Let's suppose, then, that they do that. Let's suppose they succeed, and then they go after or start denying you your ---- the Catholic Health Service's Federal funds, participation under the Federal funds. Are you out of court? If they deny it, well, they would essentially frustrate the ability for us to conduct our religious mission, which would be to ---- But you have a constitution. Don't you have a ---- you started out by saying this is a viewpoint issue. Sure. Well, don't you then have a claim against the State that they're a First Amendment claim, that they're denying, they're discriminating against you? You could. And I think under the intervention rules, one of the convenient aspects of Rule 24 is this is an overlaying issue and claim in Count 6 in the complaint in particular, where they talk about interpreting the scope of breadth of these rights. One of the overlaying considerations that has not been briefed, and I think as Judge Fletcher pointed out, the adequacy of representation, one of the overlying countervailing considerations, Your Honor, is the right to be ---- to engage in conscience, religiously based conscience, in defense or in a countervailing way around those rights to an abortion. What are the interrelationships between those two for health care institutions? The State has raised that issue in their complaint. I don't think I've heard the answer to Judge Fletcher's question, which I think is a very important one. I'd be pleased to hear it. And maybe you didn't understand it. I think what ---- Go ahead. ---- Fletcher asked, and which I'd like to have an answer to, is let's say, you know, whatever happens in this lawsuit and the Sweeney amendment survives. The Weldon amendment, Your Honor. Time Mr. Sweeney. The Weldon amendment survives or doesn't survive, whatever, but you get denied funding by this federal funding on this block grant program by the State. Is there an appeals procedure? Is there an ability to go into court and raise viewpoint discrimination? Can this constellation of issues not be raised administratively and or judicially at that point when ---- I think that was the question. That's what I'm trying to do. Possibility that that could occur. The answer is yes to the question. Talk to me about it. How does the program work and what are the appeals procedures? Your Honor, I just am running into my co-counsel's time. Okay. Not to worry about it. Thank you. The answer to the specific procedural, I think, mechanism is how this generally works is you apply for a grant for a, for example, a poverty program, most typically. You contract with a State Department of Health, for example, for a program to serve migrant workers who come into for emergency services. The State then contracts with the hospital. There's some arrangement regarding payment of those fees, et cetera, et cetera. You apply. Presumably, what comes back would be ---- I'm sorry. I'm confused. Who is the you now? I thought that was the hospital. Hospital. The hospital would apply, the health care system. Okay. In this, for example, Catholic Health Care West, the health care system. It's a hospital system. Okay. It applies for a grant program of the State. When the application comes back, they generally send a contract. The contract lays out the parameters of what the State expects for you to get that money that flows from the Federal government to the States.  They can impose conditions in that contract, for example, to require you to provide abortion services. Typically, they're not doing that right now, but they could do that. Catholic Health Care West, in my hypothetical, would not be able to execute that contract, because it would violate the ethical principles that govern Catholic Health Care, the advanced directives, which are in the record. Good. And what happens to that? And you could appeal the denial of eligibility. Whom? You would have to go to probably the Secretary of Health Services in the administration, if that were the administration. California? California. Yeah. You would be – all of the dealings would be between the system and the State of California, an agency. I'm using the health care law. You go to the Secretary of Health of the State of California. Request review, administrator review, et cetera. And that's denied. And that's denied. At that point, then, you – theoretically, I suppose you could file an action for discrimination based on viewpoint for eligibility. However – Could you – could you get administrative mandamus in superior court? Procedurally in superior court, a mandamus and a contract. Mandamus goes to generally nondiscretionary duties. I'm not sure this would be considered a non-discretionary. I thought California had a procedure the way they – Administrative mandamus. Administrative mandamus. I mean, I'm guessing. Yeah. They do. And I think it generally – I mean, the line of division in administrative mandamus is between discretionary and nondiscretionary duties. I'm not sure whether the contracting authority of an agency would be considered a nondiscretionary. So you might be able to go into state court and raise that and say – Perhaps. We've got a First Amendment right. You might also be able to go to federal court at that point, could you not? Say – claiming that you're being denied federal funding. And you could have perhaps a Fed – some sort of First Amendment-based federal – federal question claim. Right. Say what we are – they're engaging in – in religious discrimination or viewpoint discrimination, whatever, and raise the claim there. Right. I think that – I think that's a possibility. Here's the problem, Your Honor, I think. This particular case could in fact be determinative, I think, depending on what the trial court finds and ultimately a reviewing court with respect to the interplay between the ability of health care contractors, religiously affiliated in particular Before you get to that, let me just get – get one point. If you had that avenue of review, you could raise possibly – probably, likely constitutional claims. But I take it your position is that the Weldon Amendment gives you rights beyond the Constitution and that whether it's constitutionally required that you have these rights or not, the Weldon Amendment tries to make sure that you are able to exercise it. I take it your position is you couldn't raise any Weldon Amendment claims in that – in that – in that litigation. I think – If the Weldon Amendment were to be upheld. We're assuming the Weldon Amendment – No, no, I was saying let's say it was struck down. It's cut down. Let's say that – that in federal court, let's say the Weldon Amendment is struck down or – or limited. Of course, that wouldn't be binding on the State courts. And – It would. The Weldon Amendment, I think it is – it is a stretch. Unless, of course, the Supreme Court agree. Or disagree, yes. I think it's a stretch to suggest that the Weldon Amendment vests in the contracting entities, the religious affiliated entities, affirmative rights. What it does is it creates a – a federal disincentive, if you will, a carrot-and-stick approach, not a – But that's what I'm saying. You might be able to write constitutional claims, but you couldn't in that litigation raise any claims based on the Weldon Amendment. Right. So whatever rights you think are given to you by the Weldon Amendment, I think it's your position, have to be raised here or – That's correct. And that's – that's precisely the – the analysis. And I don't want to mislead the Court into believing the Weldon Amendment vests in the contracting entities, affirmative specific rights. What it does is it creates a – a carrot-and-stick approach. What Congress did was put a condition on that, the disbursement of those rights. You know, we're familiar. I think what – what I was trying to sort out, and perhaps what my colleagues were trying to sort out as well, is in asking the question, what is your alternative remedies? I mean, could you raise these kinds of claims in other kind of matches? We're trying to – I was trying to parse out what you could raise and what you couldn't raise in an alternative forum. And I think Your Honor's analysis in the hypothetical is correct. I think you lose an – if we're not in this case, we lose an avenue of potential review that really do have a material – I mean, the standard that the circuit has set is a practical effect. There is a very practical effect that – that whether or not this statute stands or falls will have on the Catholic health care system. I'm still trying to understand the practical effect. If – if the practical effect is that if the Weldon Amendment is no longer in force, you lose the – being concerned that the State of California would then resort to the medical emergency demand on your – on your providers, that you would lose, insofar as the Weldon Amendment concern, is the power or the leverage of the financial disincentive. Correct. Which would make it – That's what you would lose insofar as the Weldon Amendment. Right. Now, in terms of any other rights that you may have that you've gone through, those would all continue to exist. I would hope so, Your Honor. Our First Amendment rights. The key is you would lose your ability – and I think because the State has indicated is it would like to be able to do this. You will lose your ability to obtain those critical grants that are essential to the mission because we can't – I don't know why you would – you wouldn't get your grants. You've been getting the grants heretofore, have you? We've never been asked to provide medically necessary grants. That's true. If that changes, we're out of – we're out of the market. Unless you can say that that's illegal for – or unconstitutional for other reasons. You wouldn't be in that proceeding asserting a Weldon Amendment issue. No, but you would lose, I think, Your Honor, a very important arrow in our quiver. Yes. And so would the government, which is Congress who passed it, and that's what the Department of Justice is attempting to defeat California for. So that brings you back to the Pratt v. Bradbury problem, which is – Adequacy of – Adequacy of representation. We've come at this from a different perspective, I think, Your Honor. I don't want to eat into any more of my co-counsel's time. Thank you, Mr. Sweeney. Thank you. We'll hear from Mr. Maddox. May it please the Court. California seeks to have the Weldon Amendment declared unconstitutional so that, in its words, it might force health care professionals to provide abortions. Nevertheless, the district court held that three organizations representing over 1,200 pro-life medical professionals in this State had no interest in this case. Because these medical professionals' protected rights of conscience are directly imperiled by California and the federal government defendants not only may not but, indeed, have not adequately represented their interests, this Court should reverse the district court's denial of the motion to intervene and permit these medical groups to intervene in this case to defend the Weldon Amendment, just as they are currently intervening to defend the Weldon Amendment. Isn't the most likely influence from this chain of events is that California has these laws in the books, which, you know, for lots of reasons, most of them probably political. I mean, it is a matter of politics, so I mean, it's a matter of a political question. They don't enforce or they don't bother to apply in these funding decisions. Then along come these federal statutes, which sort of impairs the state laws, and they say, well, look, we really want to have the option of applying our state laws because we think they're important. We don't necessarily need to do it tomorrow or the next day or again for the next 20 years, but we sure don't like the idea of having a federal law that seems to prevent us from doing it. So we're going to bring a lawsuit now, you know, before, while it's timely, to sort out this question as to whether we could or could not. Isn't that really what's going on here? Your Honor. Anything more into this lawsuit other than the fact that they're trying to preserve their theoretical possibility, ability to enforce these laws? Your Honor, according to California's own submissions now on the motion for summary judgment, and I would remind the Court, we have filed a motion for judicial notice apprising the Court of the pleadings that have been filed in the last month or so on briefing the motion for summary judgment. California is now investigating what it says are refusals to provide emergency medical or emergency abortions and says that it is currently investigating those. Now, of course, California, as you've noted, California had not in fact pursued enforcement, apparently, from what we've been able to glean from pleadings, Section 1317 in its 20-year history. But California, of course, was able to defeat the motion to dismiss on standing grounds on that point, essentially by asserting that they had a concrete plan to enforce it. Well, the people they have a concrete plan to enforce it against are the people that I represent. They are the 1,200-plus medical professionals in the State of California. California is in this case and is continuing to have a case in Federal court because they are promising the Court that they intend to apply that statute to discriminate against these pro-life professionals. The success in defending the Weldon Amendment will not prevent California from conducting those investigations. Success in defending against the Weldon Amendment, this challenge to the Weldon Amendment. Defending the Weldon Amendment against this challenge, yes. According to the State of California, because, of course, California raises a coercion argument under the Spending Clause, and according to the State of California, who's the party who should know, if the Weldon Amendment stands, it will not apply. Section 1317 to force medical professionals to provide abortions. If the Weldon Amendment falls, it will. That is the basis of California's lawsuit. We have to take California at its word. And for that very reason, that's why we have a case. That's why we have an interest in this case. And it's why our interest would be impaired if the Weldon Amendment were to fail. The medical group's members are the precise people that Congress intended to protect in passing the Weldon Amendment. And under Fresno County v. Endress, that is plainly sufficient to meet the interest test. And the district court's decision holding that because California, you know, again, contrary to California's own claims, could in fact give away the $49 billion in order to impose $5,000 civil fines, and it is criminal prosecution, it's misdemeanors, and allow for private rights of action, in fact, to enjoin health care professionals and health care entities from refusing to provide abortions. So if I can be those people's attorney's fees. So can I just make sure I understand that your position is that California is not only theoretically but actively intent on enforcing Section 1317, that the Weldon Amendment is a financial barrier or at least a disincentive that you have a different interest from the Department of Justice in defending the constitutionality of the Weldon Amendment, because for you it's a shield that you don't want to have stripped away, even if you could in a collateral proceeding still assert the constitutional issues and the like, and even though the Weldon Amendment litigation itself won't preclude you from asserting those rights? We might be able to assert those rights, Your Honor, but the problem would be, of course, we would then be raising without the protection of the Weldon Amendment, which outright forbids the State of California from engaging, from forcing pro-life doctors to provide abortions. No, it doesn't. No, it doesn't prevent it. It just says there's a financial penalty of no funds if you do. And, but, again, first of all, California has been taking those funds for two years. And second of all, I'm sorry. I think we understand what your concerns are in that regard. Tell me why you think that the Justice Department is not going to protect those interests. Your Honor, the presumption of adequacy of representation only arises where the parties are urging the same interpretation of the challenge statute. There's not a single case that this Court has ever decided where the intervener and the government defendants were arguing for different interpretations of a challenge statute, and this Court held that, nevertheless, their interests were adequately represented. What statute are you in disagreeing with? The Weldon Amendment specifically. Okay. And what is the disagreement? The disagreement I would refer you to in the motion for judicial notice. The government defendants have conceded in the district court, and this is in their briefing. It's Exhibit D to the motion for judicial notice, page 9, or actually page 13, lines 14 through 16, that the Weldon Amendment, they have interpreted the Weldon Amendment to mean that if California applies Section 1317 to require a pro-life doctor to provide an abortion, that that's not discrimination within the meaning of the Weldon Amendment, as long as they also require those pro-life doctors to provide other emergency services. So in other words, if they require a pro-life doctor or a Catholic hospital to provide emergency appendectomies, it's perfectly consistent with the Weldon Amendment for them to also force them to provide emergency abortions, as California defines the term emergency, by the way. Excuse me. This is the Department of Justice saying this? This is the Department of Justice's brief in response to the motion for summary judgment. This is the U.S. Department of Justice. That is correct, Your Honor. This is the argument below, and that completely, it essentially, it takes out the Weldon Amendment's teeth in order to save it on its face. And it is completely contrary to the interests of our members. The entire purpose of the Weldon Amendment, which is a statute that they advocated for, is to protect them against situations like Section 1317 in California that would actually force them to provide abortions. And the interpretation urged by the defendants, current defendants, is not only contrary to their interests, it in fact concedes, essentially, one of the arguments from California, one of their alternative claims for relief, the seventh claim for relief from California, was for this interpretation. They've now provided it to them. And although they've done so in an attempt to defeat California's standing, they've now asked the district court, or provided the ammunition now, for the district court to hold that Section 1317, or that California has no standing in this case, because it is perfectly free to apply Section 1317 to force pro-life doctors to provide abortions. That's completely contrary to their interests. I know that I'm well over my time, but I would like to reserve just a moment for rebuttal if that's okay. Thank you. We'll hear from the opposing side. Good afternoon, Your Honors. Thank you for your support. My name is Antoinette Cordero, Deputy Attorney General on behalf of the plaintiffs. Would you pull the mic just down a little there? Sorry about that. Yes. Antoinette Cordero, Deputy Attorney General on behalf of the plaintiffs and appellees in this case. I will be using approximately 12 minutes of our allotted time, so I may reserve approximately eight minutes for counsel for defendants of the Federal Government. I will address the proposed intervener's failure to meet the requirements, essentially, for intervention, which is, as this Court has acknowledged, their failure to demonstrate that they have a significantly protectable interest that is related to the subject matter of the underlying litigation here, and also their failure to demonstrate that any interest that they do have would be impaired or impeded, that they were so situated that that interest would be impaired or impeded by the resolution of the claims in the underlying litigation. I think perhaps one of the reasons why this Court found some of the arguments here a little confusing and difficult to follow is because of the ---- I really didn't. Well, I think ---- Why don't you just make your argument? My argument is that proposed interveners have changed the argument and their rationale for what their injury is.  And that that concern turns on an interpretation of the word emergency within the California statute, and also on, raises the issue of the constitutionality of the California statute, which is not an issue in the underlying litigation.  federal spending restriction, and whether that federal spending restriction is constitutional, and whether Congress exceeded its authority under the spending clause of the U.S. Constitution in enacting that provision. These interveners would seek to hijack that underlying litigation and turn it around and convert it into litigation challenging the constitutionality of a state statute, and also into a determination. I didn't hear them say that. I didn't read that in a brief. What they said is we have a federal law that was passed to bully California into not enforcing certain laws that we find anathema. We don't like these laws. We think they may be unconstitutional, but beyond not being constitutional, we just think that they would force us to violate, to do something that we can't do, and therefore we've been denied funding. So we want to come in and argue for the broadest construction of this federal law, which will then, if our construction is accepted, it will put the greatest pressure on California not to enforce its own laws against us. I don't – that's what I understood the argument to be in. I didn't hear that they said anything about constitutionality of the state law or anything of that sort. Well, Your Honor, in order for them to articulate a significantly protectable interest, which is one of the requirements to meet the intervention – the rules for intervention, they have to demonstrate that some – that they have some interest, some significantly protectable interest that is being threatened here. They did articulate it. They said you have laws in California that might be applied against us that would deny us funding or force us to do things that we find morally reprehensible, and we want to have this federal law, which pays California essentially not to enforce its own laws, pays many billions of dollars. We want that construed broadly to keep California – essentially broad California into not enforcing its own laws. But it's not – it's not sufficient for them to claim that they have an interest in trying to discourage them from doing. They must also be able to demonstrate that that interest is significantly protected by something, by some law. And in this case, that law would be either the U.S. Constitution, the United States State Constitution, or other civil rights laws. Where do you get that? I'm sorry? They say we have a Weldon Amendment. Our interests are served by the Weldon Amendment, or the Sweeney Amendment, as I call it, the Weldon Amendment, that Buffalo is a state of California to the tune of $49 billion to leave us alone. Well, I – what more do they need? They need to demonstrate – if you look at Donlevy-Glickman, which is a Ninth Circuit case, the Court said that an applicant must have a significant protectable interest. And in order to show a significant protectable interest, it must assert an interest that is protected under some law. So if they are asserting that they have an interest in not having to perform those abortions that they object to, that interest must be protected by some law in order for it to be a significant protectable interest. Why can't the Weldon Amendment be that? Doesn't it provide them some protection by creating this monetary shield against or disincentive against California trying to enforce 1360 – 13-whatever it is. 17-whatever. 1317. 1317. It doesn't, Your Honor. It doesn't. It provides the U.S. government with a remedy, one we think is unconstitutional. Practical remedy. It's a practical protection. But, Your Honor, practical protection, I think, in this case, the protection that they are asserting they get from the Weldon Amendment is really no different from the protection that the proposed interveners in the United States v. City of Los Angeles were claiming. In that case, the City of Los Angeles and the United States government were entering into a consent agreement that would govern how its police department was going to go forward, how the city's police department would go forward. But there they had – that was somewhat different because there the proposed interveners still had rights to make complaints against the LAPD officers. They could bring civil rights actions against them. They weren't being compelled. They weren't being threatened to have their beliefs interfered with by an enforcement of a law against them. And in this case, the distinction I'm at least hearing here is that they're saying the Weldon Amendment – we have the rights to go out and face up to California if they come after us under 1317, 1617. 1317. 1317, whatever. Okay. The statute.  The State statute. They have the right to come after us. And, yes, we can then raise these arguments about constitutionality and First Amendment and the like. But with the Weldon Amendment in place, we have this added protection. And that's the law we are protected by. Now, I'm not sure that that gets them all the way home, but it does seem that there's at least an arguable protected interest. So what's your response as to why or why not they are impacted? You said there were two parts to the test. So what's the impacted or impeded prong? What's your argument on that? The argument on that is that they will continue to have whatever remedies they currently have. The Weldon Amendment does not provide them with any additional remedy that they don't already have. If, for example, we were to assume that California were to enforce 1317 to compel an unwilling health care provider to perform an emergency abortion, that that would constitute a violation of some law. They still have whatever remedies they currently have. Your point is that you'd never get there because California would never jeopardize $49 billion worth of funding over 1317. So you don't even get to apply those other remedies because that's the point. The point is, you know, they're much better off with the Weldon Amendment in place and broadly construed than they are without it. I think that's a difficult point to argue with, isn't it? Again, and that's why I come back to United States v. City of Los Angeles, because that very same argument could have been and probably was made in that case. Those potential interveners had the real potential of having a consent degree that actually prohibited the police department from doing the very things that they alleged it had in fact done in the past. They had a stronger argument because they alleged that they had actually been victims of the very kind of activities that they were trying to prohibit in the future and would be victims again in the future. And yet ---- I agree with Arakaki v. Cayetano. I beg your pardon? The case of Arakaki v. Cayetano, 324-510-78, 2003 case. Your Honor, let me. I'm sorry. That was the case involving Native Hawaiians. Oh, yes, Your Honor. Well, that ---- in that case, the court found that their interests were adequately represented by the government defendant in the case, which is an issue that my ---- That was a different part of the analysis. I'm talking about the protectable interests part of the analysis. Well, in that case, the court found that there was ---- that there was a different issue with respect to whether they had adequate remedies. In this case, the remedies that they have are adequate and not impaired, not impeded. I'm sorry, Your Honor. And I'm trying to not ---- the facts of that case are not rapidly coming back to me, and I'm trying to find this here. If you don't have ---- I'm sorry. If you have something, you can articulate it. Yes. Let me ask. I'm sorry. I do have something here. Let me ask an allied question. As I understand the argument at the other side, the State of California is seeking an interpretation of the Weldon Amendment, if it is found to be constitutional, which would define what emergency services are and what are necessary emergency services or necessary services, medical services, so that the Weldon Amendment wouldn't give the full protection that they are seeking. Is that an issue in the case? No, Your Honor. The State of California is not seeking a determination as to what an emergency abortion constitutes or what constitutes an emergency situation. What the State of California is seeking is the determination of what constitutes discrimination. And the declaratory relief that the State is seeking would be relief, a declaration that says that enforcement of facially neutral laws that apply to all emergency healthcare, provision of all emergency healthcare services, not just abortion, is not discrimination. The Weldon Amendment only prohibits discrimination based on the refusal to perform abortions. But I would gather they would wish that this would not be discrimination for them to or that it would be discrimination to require them to perform abortion services under some circumstances. Is it an issue in the case, not that it's right, not that it's wrong, but is it an issue? The issue of whether requiring a healthcare provider to provide emergency medical services, regardless of what they are and regardless of whether the healthcare provider has a religious, moral or ethical objection, is an issue in the case. What constitutes an emergency is not an issue in the case. And that is one of the problems with the proposed intervention, is that it would broaden the scope of the underlying litigation to bring in extraneous issues that are not properly before the court. But that's a point that cuts against you as much as for you. Because they want to bring in new issues that are not. Exactly. The government, for its own reason, does not, I mean the United States government, chooses not to make an issue of that, but they say that's very much an issue. We, in fact, do not. We think this needs to be an issue in the case for our full protection. I think there's a distinction between what is an issue in the case and what are the arguments that are being made in the case. The issues in the case are really governed by the pleadings. The arguments that the U.S. government chooses to make in terms of responding to the issues that are raised by the complaint, perhaps interveners have an argument that, if they're not raising the correct arguments, that they may be able to augment those arguments. But they can't broaden the issues that have been framed by the complaint in this case. And the issue of what is the meaning of an emergency is not framed by the complaint in this case. One other quick point I want to make, because I am bleeding over in my time, is that they have also the option of participating as an amicus curiae. Assuming that they are willing to confine themselves to the issues that are actually before the court, they can file an amicus brief, and the State of California would have no objection to that. I also want to make it clear that the State of California is not taking the position that all abortions constitute emergency abortions. And finally, I think it's really important to note that the intervention in this case would circumvent the rules on Article III standing. The plaintiffs really should be, I mean, sorry, the proposed interveners, really if they want to challenge the meaning of the California statute and whether it can be constitutionally applied to them. Interveners need to have independent Article III standing? They would need to have independent Article III standing if they were to do this correctly, which is in a separate action. Well, of course. But do they do interveners? I'm not aware of any case that says that interveners need to establish independent Article III standing. It may be a good idea, and it may in fact wind up being what the law is, but I actually was worried about this. Best I could tell by looking into it, there's no case that says that. The case that comes closest is Southwest Center for Biological Diversity, which is cited at page 23 of our brief, and which says that, while noting that the Supreme Court has declined to decide whether a would-be intervener under Rule 24A2 must satisfy Article III standing, we in the past acknowledge that the standing requirement is at least implicitly addressed by a requirement that the applicant assert an interest relating to the property or transaction which is the subject of the case, of the action. So there's certainly a suggestion. That's clear as mud. Your Honor, it is clear as that even that quotation recognizes. It is not, has not been clearly resolved by the Supreme Court. Okay. Fair enough. We'll hear from the government. So it doesn't split my mind. Counsel asked us to take judicial notice of summary judgment proceedings. Is California or the Department, the government, objecting to taking such judicial notice? The United States doesn't object, and I don't think California objected either. May it please the Court, I'm August Fungi with the Justice Department. I want to focus first on the issue of adequate representation. It sort of hits home with you, right? It does. Well, if they did intervene, they'd be on our side, so I think it's appropriate for me to start with that. This case is a facial challenge to an act of Congress. In those circumstances, the United States will vigorously defend the statute. In fact, it's obligated by Congress to defend federal law. It's the quintessential example, I think, of where the United States will adequately represent the interests of anyone who would be protected by that statute. It's a much easier case than even the city of Los Angeles case, which I think is our strongest case on this point. There, the United States was enforcing civil rights laws against the city of Los Angeles, citing violations against members of the Los Angeles community. When the members of the community sought to intervene to challenge or question terms of a consent decree, this court said, well, the United States represents the very constituents at issue, these members of the L.A. community. And even though the United States might reach different terms of consent. You know, this is interesting, but what do you – why don't you address some of the examples given by opposing counsel as to why they specifically point out that, in fact, the government is not taking as broad a position as they would like? I think it was – I believe it was Mr. Maddox who gave a couple of examples I thought were quite concrete. Well, I invite the Court to look at page 13 of our summary judgment brief, which Mr. Maddox cited. We do not argue there that the Weldon Amendment would not apply in a situation where the State treated abortion the same way as it treats an appendectomy. We say that's a possible interpretation, but we do not adopt that interpretation. And in a case like this where we have a facial challenge to an act of Congress, it wouldn't be appropriate. Because it's a facial challenge, we're talking about much more broad issues. Is it constitutional in the bulk of its applications? We don't need to go into specifics of how it might apply in specific circumstances. Well, you could very well, in an effort to save an act of Congress, you would – could very well and, in fact, probably would have a duty to offer a narrowing construction in order to avoid constitutional problems. So if you thought a narrowing construction would be the best way to save the statute, you'd be obligated to present that to the Court. I think that's certainly the Court's obligation to interpret a statute. Well, let's not talk about the Court. I'm asking you about your obligation as a representative of the United States. I mean, you are there to defend the statute, and there are broader and narrow ways of defending the statute, and you might well offer – you could well offer a construction that is less broad than the broadest construction in an effort to avoid this or that constitutional infirmity. And you would not only be empowered to do that and be able to do that in good faith, I believe you'd be obligated to do that pretty much to do anything that's honorably possible to save the statute. We certainly have some authority in interpreting the laws that we're enforcing. But at the same time, we have the summary judgment briefs in front of us now, and this Court in other cases is saying you have to have a very compelling showing in a situation like this where we have the government whose interests are aligned with a private party. The briefs do not make the argument that the – What objection could you possibly have to getting the help? We would love to have them as amicus. We'd love to get, you know, if they want to call with suggested arguments, we'll listen to them shortly. Well, it's not quite the same. It's not quite the same. I mean, we'll call – I think that's his answer. Well, I mean, you've got to understand, there's a lot of Federal laws out there and a lot of lawsuits challenging those laws on constitutional grounds. Say taxpayer money, you know. You know, they can do the work for you. I'm not sure I – Well, look, you become a hero in your own department, you know. We'll still have to write our own brief, I believe. That could help. I actually think – I actually think the opposite is true. I mean, the reason – I mean, that's the practical answer. The practical answer is the reason you don't want them there is that they would make your job more difficult, which is another saying of shirking from hard work. But the reason they would make your job more difficult is that they would limit the kind of tactical positions that a litigant sometimes makes in retreating, narrowing, compromising, whatever, in order to achieve what it thinks is the best result for its client. And if you had them as co-parties, some of those retreats and compromises would not be possible to you. That's the practical answer, isn't it? I think there are institutional interests in efficiency, but I'm not sure they apply in this case. I think the overarching concern of the Federal Government is to, when we have a direct challenge to a statute, rather than have these cases adorned like a Christmas tree of parties that are intervening. I mean, there could be many, many parties seeking to intervene. I thought the problem with bringing another group in, interveners in as parties, gave them co-equal standing with the Department of Justice as having an interest in the litigation. And the Justice Department might argue for a narrowing construction, not necessarily, you know, not be rendered incapable of doing so, but the other parties to the litigation would take a contrary position. So you don't have, as parties, you don't have to come up with a common position, do you? I think if we look at the city of Los Angeles case, that was a problem there, but the court said we still presume adequate representation. There you had members of the community with direct individual constitutional rights at stake, and the court nonetheless said we are going to presume that the United States is adequately representing these parties. The United States could have entered into a narrower consent agree than some of the members of the community would have desired, and the members whose actual constitutional rights are being violated. Here we have one step removed. The Walden Amendment does not confer individual rights. It is a funding limitation designed to help protect the proposed intervenors. Do you agree or do you dispute that this, the Walden Amendment was passed for the special benefit of the protection of people who are essentially represented by intervenors? Absolutely. It's one of a series of conscience protection measures that Congress has put into law since the early 70s dealing with this area. I'm sorry. Absolutely, you do dispute it. We do? I wasn't sure what you were agreeing with. I'm sorry. We don't dispute. You don't dispute, and you say absolutely. I'm not sure whether you mean absolutely you don't dispute. Absolutely no dispute. So you agree that they are in fact, it was passed for their specific. Yes. I agree with that statement. They are the intended beneficiary of this law using the encouragement of Congress's conscience rights. But the conscience rights they have do not, are not in this statute. If a California prosecutor goes after one of their members, they can't say, well, the Walden Amendment stops you from doing it because it doesn't do that. It's a funding restriction. But they can count on California not doing that out of greed, you know. Greed is a very powerful human force. And they can count on the fact that the taxpayers of California will not care so much about their statutes as to spend $49 billion of additional taxes. Yes, that is true. It's pure economics, pure greed, you know. The test is some sort of legally protectable interest, though. If they have no legal protection from the Walden Amendment. But if Congress chooses, you know, sees this group of people, citizens, you know, individuals and says, we choose to give them protection, which you've said that's what they, and they choose to do it. Rather than passing an affirmative statute, they choose to do it through the spending power. That's the way Congress chooses to. That's no less something that is for their special benefit. It's certainly for their benefit, but it's not a legally protectable interest. If Congress had passed this law instead and said, if you take our money, State of California, you have to consent to lawsuits filed by members of intervener organizations, then we might have a legally protectable interest once the State took the money. But this law does not create that sort of an interest. It's a funding restriction. It's an encouragement. And their legally protectable interest could stem from the First Amendment, stem from perhaps Title VII and other statutes. Those interests are not impaired one bit. When California goes after them, if they go after them for violating their laws, they will be able to cite those interests. They will not be impaired in any way. Kennedy. Thank you. If there are no further questions, thank you. We'll give you a couple of minutes for rebuttal. Two minutes. Thank you, Your Honor. I will attempt to divide some of that time with Mr. Sweeney. First of all, U.S. v. City of Los Angeles has come up several times. It doesn't at all stand for the proposition that they are saying it does. In U.S. v. City of Los Angeles, the community members there did not object to any of the terms of the consent decree. They just sought to enforce the consent decree. We strongly object to the interpretation of the Weldon Amendment that the Federal government defendants have offered. And although they say that it is its – well, it's not really an interpretation we've offered. It's something that I'll read plainly. What does it say? We don't have it in front – at least I don't have it in front of me. The language from page 9 of their brief in opposition to the motion for a summer judgment. In the first place, because – this is at lines 8 through 11. In the first place, because Section 1317 applies to medical emergencies involving any life-threatening or other serious condition, and not simply abortions, it does not on its face constitute discrimination within meaning of the Weldon Amendment as defendants have acknowledged. And in citing to their discovery responses, they say that the Weldon Amendment does not prohibit California from – does not prohibit the application of Section 1317, doesn't prohibit it on its face, and natural reading is, or in a non-discriminatory fashion, as long as you're requiring them to do other things, other medical emergencies, then you can also require them to provide abortions. That's the interpretation that they have urged. So we have a – it's unlike the – Let me – let me – That's fine. If you're finished answering – No, I had a couple of quick points I wanted to make if that's – I'm finished with that answer, but – Well, if you're finished with that answer, you're not on the – tell me about the practical effects of our granular relief here. I mean, the cases at the summer judgment stage in the district court, we would be under fairly massive disruption of the litigation if we were to grant relief, wouldn't we? Your Honor, first of all, I would, of course, remind the Court that this – our motion to intervene, at least, was filed 11 months ago. The Court set the hearing at its first available date and then postponed the hearing. I think you can assume we're – I'm aware of the chronology in asking the question. Nevertheless, that's what's happened. And under Smith v. Marsh and U.S. v. City of Los Angeles, this Court has said that the fact that, to some degree, the apple cart – or that you don't have to overturn the apple cart because we'd be intervening. It would mean that we would go back down and intervention would be – we would be able to intervene on the date that the – that that occurred. Now, the decision on the motion for summer judgment – or the hearing on motion for summer judgment is set for June 23rd. So I would not propose to attempt to speed the Court along. But just to apprise you of that fact, that's the date that is set for the hearing on motion for summer judgment. We would, of course, hope to either participate in that or to – to get in before that point to allow us to be able to participate not only in briefing but even in discovery. Gain access to the – Is there any indication that you wouldn't be able to file, even if we haven't ruled, amicus briefs? Your Honor, we would be able to file an amicus brief, of course, as this Court, again, has noted on – I know the difference between an amicus and a party, but you're – you're saying you would hope to go in and participate and you're worried about your point of view getting across, at least insofar as you have legal arguments to make. Right. Your Honor, the problem is that as an amicus, of course, you can't introduce new – new issues not before the Court. And the way the – the current parties have – have phrased our interest in, for example, having the term medically necessary or medical emergency defined in some way is a new issue, which is, frankly, puzzling to me because California seeks a declaration and an injunction prohibiting the – the Weldon Amendment from being enforced in a medical emergency or in medically necessary abortions. And yet, when we come in and say, well, what do you mean by medical emergency or medically necessary abortions, then they say, that has nothing to do with this case. That's a perplexing argument. But you agree, at least as a structure, that that would be a new issue? Well, at least as the way the parties have – have understood it and the way the district court currently understands it, it would be a new issue. And so we would be left in a difficult position to make that point. We also couldn't engage in discovery to try to find out how California would actually apply Section 5. I understand. I'm – I'm just saying, you – you were raising the speed of a decision issue. I'm just postulating that it's not all or nothing pending any decision of ours. That is true, Your Honor. You've got minus 1 minute and 43 seconds. How much do you want to yield to Mr. Sweeney? Thank you. I'll reserve. Thank you, Your Honor. One minute, Mr. Sweeney. Your Honor, I would just simply point out to the Court, with regard to the United States v. Los Angeles, I think the position of the – certainly my clients, the alliance, is much more akin to the position of the police intervenors than the community intervenors, which is why it's a curious citation that – that counsel relies on. The police, in that particular case – this Circuit reversed the decision denying intervention and ordered them into the case as a matter of right because, in that particular case, their members were directly affected by findings that occurred in the consent decree. I think that's a lot closer to what is happening in this case with respect to the alliance than the community, which simply had sort of a broad, amorphous interest in not having police violence. So I would just point that out, and I would submit the matter, unless the Court has any other questions. Thank you, counsel. I must commend all counsel on what has been, I thought, an exceptionally good argument. Thank you. Thank you all. This order is submitted, and we are adjourned.
judges: B. Fletcher, Kozinski, Fisher